IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THE GOODYEAR TIRE & RUBBER COMPANY,<br>200 Innovation Way<br>Akron, Ohio 44316,<br><br>*Plaintiff*,<br><br>vs.<br><br>PREMIER INDUSTRIAL SERVICES, LLC,<br><u>Address 1</u>:<br>3750 S. US Hwy 287<br>Corsicana, TX 75109,<br><br><u>Address 2</u>:<br>c/o Statutory Agent:<br>John C. Capps<br>214 Commerce Street – Box 208<br>Maypearl, TX 76064,<br><br>*Defendant*. | CASE NO.<br><br>JUDGE<br><br><br><br>**COMPLAINT FOR BREACH OF CONTRACT AND NEGLIGENCE**<br><br>**Jury Demand Endorsed Hereon** |

Now comes Plaintiff The Goodyear Tire & Rubber Company ("Goodyear"), and for its Complaint against Defendant Premier Industrial Services, LLC ("Premier"), alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Goodyear is an Ohio corporation that is headquartered at 200 Innovation Way, Akron, Ohio 44316 and is therefore a citizen of Ohio.

2. Premier is a contractor company engaged in serving heavy industrial companies in a variety of industrial, mechanical & construction related services. Premier is a limited liability

company organized under the laws of Texas with its principal place of business located in Navarro County, Texas. Based upon reasonable inquiry and investigation, and information currently known, neither Premier, nor any of its members, are citizens of the State of Ohio.

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court has *in personam* jurisdiction over the Premier because Premier agreed to the exclusive jurisdiction of the state or federal courts of Summit County, Ohio under the terms and conditions of the Purchase Order attached hereto as **Exhibits 1 and 2**. (See ¶25 of Exhibit 2).

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Goodyear's claims occurred in this judicial district and because Premier consented to an Ohio forum in the agreement which forms the basis of this dispute. (*Id.*).

## ALLEGATIONS COMMON TO ALL CLAIMS

### Background

6. Goodyear owns real property located at 1 Goodyear Blvd. in Lawton, Oklahoma which serves as a manufacturing plant (the "Plant").

7. The Plant manufactures rubber compounds that are used in the manufacturing of consumer tires, including original equipment ("OE") tires for certain automobile manufacturers.

8. As part of the manufacturing process, the Plant uses eight industrial mixers that blend together the raw materials used to make modern rubber for tires.

9. Unless scheduled for a planned outage, all eight mixers are in continuous use, twenty-four hours per day, in order for the Plant to operate at full production.

[1541603]

10. The mixing process utilizes multiple, separate pieces of equipment including but not limited to: (a) a mixer body; (b) a separately-installed ram that can be connected to the mixer body or detached therefrom as needed; (c) a separately-installed stationary gearbox; (d) separately-installed stationary motors that can be connected to power the mixer when in use; (e) a stationary mixer plate upon which the mixer body sits when in use; and (f) various piping, hydraulic lines, water lines, and electrical wiring that connect the mixer body to the gearbox, motors, and other equipment.

11. Given their continuous use, both the mixer bodies and the rams generally need to be replaced every seven to ten years.

12. The separate gearbox, motors, mixer plate, and the various piping, hydraulic lines, water lines, and electrical wiring remain in place and are not replaced as part of the mixer body replacement.

13. The process for replacing a mixer body involves disconnecting the mixer body from the various piping, hydraulic lines, water lines, and electrical wiring that are connected to the gearbox and motors. The old mixer body is then disconnected from the gearbox and lifted out of place.

14. Once the old mixer body is removed, the new mixer body is lifted, moved into place, and then lowered onto the mixer plate. After the new mixer body is in place, the new mixer body is re-connected to the gearbox and to the various piping, hydraulic lines, water lines, and electrical wiring.

15. The entire process typically takes 7-9 days to complete, depending on which mixer is being removed and replaced, and is scheduled during planned shutdown periods to eliminate or minimize production downtime.

16. In 2020, Goodyear purchased a new mixer body, known as a Kobelco Banbury 370L Mixer # 16645, to replace the mixer body in what is referred to as mixer no. 7.

17. Due to the particular use of mixer no. 7, the mixer body ("Mixer Body No. 7") needs replaced more frequently than the other mixers at the Plant.

18. As a result, Goodyear engineers included a monorail above mixer no. 7 to assist in lifting the old and new mixer bodies.

19. The new Mixer Body No. 7 was delivered to the Plant and ready for installation by December 2020. Installation was planned to be completed during an annual, scheduled shutdown of the Plant that occurred at the end of every calendar year.

20. Goodyear hired Premier to perform the removal of old Mixer Body No. 7 and the installation of the new Mixer Body No. 7. In connection therewith, Premier filled out, and agreed to the terms contained in, a Goodyear Standard Purchase Order that was issued on December 14, 2020. A true and accurate copy of the December 14, 2020 purchase order between Goodyear and Premier is attached hereto as **Exhibit 1**. This purchase order incorporates the terms of Goodyear's purchaser terms and conditions (the "Terms"), a true and accurate copy of which are attached hereto as **Exhibit 2**. Exhibits 1 and 2 are collectively referred to herein as the "Purchase Order."

21. The Purchase Order states that Premier was to perform two services for Goodyear: (1) remove the old Mixer Body No. 7 and (2) offload and install the new Mixer Body No. 7 upon arrival.

22. In exchange for the above services, Goodyear agreed to pay Premier a total of $137,780.00 with thirty percent (30%) due as a down payment and the remaining seventy percent (70%) due upon final acceptance of the services to be performed.

23. In the Purchase Order, Premier warrants, among other things, that its work shall be free from defects in materials and workmanship, and agrees to indemnify Goodyear for any and all losses, damages, attorneys' fees, and costs arising from Premier's work. Specifically, the Purchase Order states:

> (2) **Definitions**…."Goods" means and includes the materials, deliverables, supplies, articles, equipment, structures, work and/or services covered by this Purchase Order. "Including" means including, without limitation…."Person" means and includes any person or entity. "Purchaser" means and includes the entity identified on the face of this Purchase Order and any parent, subsidiary, sister or affiliated company of Purchaser, and with respect to Seller's obligations to provide Indemnification and/or reimbursement shall include the directors, officers, employees, agents, consultants and insurers of each of the foregoing Purchaser entities, provided that nothing herein will be deemed to or will cause any entity other than the Purchaser entity identified on the face of this Purchase Order to be responsible for any payment or other obligations hereunder…."Seller Associated Person" means and includes any parent, subsidiary, sister or affiliated company of Seller and any Person who or which performs services for or on behalf of Seller in any capacity, including, employees, agents, representatives, subcontractors and vendors of Seller….
> .
> (3) **Warranty**. Seller warrants that all Goods will (a) be new and not contain any reconditioned parts or materials unless otherwise specified on the face of this Purchase Order, (b) conform to all applicable Laws…, (c) conform to the specifications, drawings, samples, labels and other descriptions furnished or specified by Purchaser, or if not so furnished or specified, mutually agreed in writing by the parties, or if not so mutually agreed, furnished by Seller (provided that in such event the applicable specifications shall be Seller's specifications in effect at the time of shipment), (d) be of first class quality and workmanship, merchantable, suitable for the purposes intended and free from defects, whether patent or latent, in material, workmanship, design and title,… and (f) to the extent consisting of services, be executed in a professional, good and workmanlike manner by qualified, trained, experienced, careful and efficient workers in strict conformity with the highest standards of the industry and trade(s). Seller also, without limiting the foregoing warranties, extends and assigns to Purchaser its rights under and the benefits of any standard warranty of Seller applicable to the Goods, and all warranties of any subsupplier or subcontractor as to the Goods and the components thereof….Seller shall Indemnify Purchaser for all Liabilities and/or Expenses, foreseeable or not, suffered or incurred by Purchaser in connection with a breach of applicable warranties (including transportation, storage, administrative, and other incidental expenses of Purchaser).

(15) **Indemnity**. Seller shall Indemnify Purchaser against any and all liens, Claims (including those of the parties, their agents and employees), liabilities, damages or injuries of any kind or nature … to property, and any and all losses, fines, judgments, awards, penalties, expenses (including attorneys' fees, expert fees and other legal expenses and amounts paid in settlement) and costs, … in each case whether or not related to any third party Claim ("Liabilities and/or Expenses"), directly or indirectly caused by, and/or arising out of or in connection with, in each case in whole or in part, the Goods, Seller's actual or alleged breach of its obligations or warranties hereunder, the activities of Seller or any Seller Associated Person pursuant to, or in connection with this Purchase Order, including any action or omission of Purchaser or those acting on Purchaser's behalf, any defect in, or condition of, the premises where the work is performed, or any materials furnished by or on behalf of Purchaser, except to the extent resulting solely from the gross negligence or willful misconduct of Purchaser and except to the extent contrary to applicable Law. Seller's Indemnity obligations hereunder shall not be limited to the extent of any insurance available to or provided by Seller….

(Exhibit 2).

## The Incident

24. On or around December 22, 2020, Premier and Goodyear began the process for removing and replacing Mixer Body No. 7 during a scheduled plant shutdown between December 23, 2020 to January 02, 2021 in order for mixer no. 7 to be fully operational when the Plant reopened on January 2, 2021.

25. As part of the process, Goodyear personnel disconnected the gearbox and electrical wiring that connected to the old Mixer Body No. 7.

26. For safety purposes, Goodyear personnel then locked out every energy source supplied to mixer no. 7, including water and electrical. Premier personnel verified this lock out procedure was performed correctly.

27. Goodyear personnel then put all keys in a lock box ensuring that the auxiliary equipment could not be powered back up during the removal and replacement of Mixer Body No. 7.

28. Premier then successfully lifted and removed the old Mixer Body No. 7.

29. On or around December 23, 2020, Premier attempted to lift and move the new Mixer Body No. 7 using the Plant's monorail and polyester lifting straps that were selected and provided by Premier. The new Mixer Body No. 7 weighed approximately 65,000 pounds.

30. The new Mixer Body No. 7 had four lifting points, two lifting points on each side.

31. When the new Mixer Body No. 7 was approximately 3-4 feet from the position in which it was to be lowered onto the mixer plate, one of the polyester straps broke, redistributing the load to the three remaining polyester straps and causing the remaining straps to break.

32. After the fall occurred, Goodyear discovered that Premier had positioned the failed polyester strap against the rough edge of the mixer body where the ram bolts into the mixer body without using a so-called "softener" between the rough edge and the polyester strap.

33. When the new Mixer Body No. 7 fell it crashed into the middle of the Mezzanine of the Plant.

34. As a result of the fall, the new Mixer Body No. 7 was extensively damaged.

35. In addition to the damage to the new Mixer Body No. 7, the fall caused significant, consequential damage to other property at the Plant, including but not limited to: (a) the mixer base plate; (b) the gearbox and the output shaft on the gearbox; and (c) the motors where the Mixer Body No. 7 ultimately landed.

36. As a result of the damage caused when Premier dropped the new Mixer Body No. 7, Plaintiff immediately and necessarily incurred significant funds inspecting, repairing and replacing the damaged equipment. These necessary expenditures included, but were not limited to: (a) repairs to the gearbox and output shaft, requiring removal of the top of the gearbox, which weighs between 6-7 thousand pounds – an extensive undertaking; (b) repairing the motors; and (c) repairing various other equipment damaged in the fall.

37. To ensure the Mezzanine was structurally sound after the approximately 65,000-pound Mixer Body No. 7 crashed into it, Goodyear retained a civil engineer to inspect the Mezzanine at a significant cost to Goodyear.

38. As a result of the incident, mixer no. 7 was not operational until the afternoon of January 26, 2021, at least 24 days after the date that was contemplated by the Purchase Order and the parties.

39. As a result of the incident and the additional downtime of mixer no. 7, the Plant was not fully operational and was unable to meet production numbers.

40. As a result of the incident and the additional downtime of mixer no. 7, the Plant was required, and did, engage in efforts to mitigate its losses due to the damage to its property and associated downtime, including, but not limited to, obtaining certain raw materials from other sources in an effort to keep the Plant as operational as possible and to meet its commitments to its OE customers.

41. As a result of the incident and the additional downtime of mixer no. 7, the Plant was also unable to sell its rubber to other Goodyear plants.

**Notifying Premier and Its Insurer of Goodyear's Damages**

42. On January 22, 2021, Goodyear sent a letter to Premier informing it that Goodyear was requesting Premier pay its damages that occurred as a result of Premier's mishandling of the Mixer Body No. 7. A true and accurate copy of this letter is attached hereto as **Exhibit 3**.

43. Goodyear has suffered significant damages as a result of Premier's conduct, including costs associated with the new Mixer Body No. 7 and the other equipment and property damaged during the incident, including but not limited to:

[1541603]

    a. $574,400.00 in costs for an inspection, damage assessment, and repairs to the new Mixer Body No. 7;

    b. $343,779.18 for the inspection, seals, machine work, bearings, and the disassembly and reassembly of the damaged gearbox;

    c. $115,809.34 for demonstration and recovery of the new Mixer Body No. 7, BB7 Mix Reducer Lifts and Allied Steel mixer labor;

    d. $86,867.37 for recovery and installation of mixer No. 7's piping, and repairs to its TCU/Hydraulic piping and pipe-lifting;

    e. $138,979.00 for the inspection of and repairs to motor that services mixer no. 7's and

    f. $25,859.89 for rental equipment used during the BB7 Mixer's recovery.

44. In addition to the above expenses, Goodyear has suffered significant procurement losses and losses to production and profits during the period of time its property and equipment were damaged and mixer no. 7 was inoperable.

45. Goodyear has demanded from Premier full compensation for all damages caused by Premier on December 23, 2020. A true and accurate copy of Goodyear's November 2, 2022 letter is attached hereto as **Exhibit 4**.

46. As of this date, Premier has refused and continues to refuse, to pay the costs and expenses it is liable for pursuant to the Purchase Order and under applicable law.

47. Goodyear, on the other hand, has and continues to, at all times, comply with its obligations under the Purchase Order and applicable law.

## FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

[1541603]

9

48. Goodyear incorporates by reference, as if fully restated herein, the allegations set forth in the previous paragraphs of its Complaint.

49. The Purchase Order is a valid and enforceable contract between Goodyear and Premier.

50. Goodyear has timely and fully performed all of its contractual obligations under the Purchase Order.

51. Premier breached its contractual obligations under the Purchase Order by failing to complete the services it contractually agreed to perform in a manner free from defects in materials and/or workmanship.

52. Premier breached its contractual obligations under the Purchase Order by damaging Goodyear's property and causing Goodyear to incur significant costs in repairs and lost profits.

53. Premier continues to breach the Purchase Order by failing to pay for the damage it has caused to Goodyear's property and the resulting repairs and lost profits, including by failing to indemnify Goodyear as required by the Purchase Order.

54. Premier continues to breach the Purchase Order by failing to indemnify Goodyear against and any and all losses, expenses, and costs, directly or indirectly caused by, and/or arising out of or in connection with Premier's breach of its obligations.

55. All of the foregoing constitute a breach (or multiple breaches) of the Purchase Order and have directly and proximately caused and continue to directly and proximately cause Goodyear loss in an amount to be determined at trial but not less than $1,285,694.78, plus interest at the statutory rate.

56. Premier's breaches have also directly and proximately caused Goodyear to suffer procurement losses, losses to production and profits, and other consequential damages suffered

during the period of time mixer no. 7 and other property was inoperable, or resulting therefrom, in an amount to be determined at trial but not less than $75,000.00.

57. Pursuant to the Purchase Order, Premier is also liable to pay for all of Goodyear's expenses and costs, including attorneys' fees, expert fees and other legal expenses, associated with the litigation of this matter and Goodyear's attempts to enforce the Purchase Order.

## SECOND CLAIM FOR RELIEF
**(Negligence Against Premier)**

58. Goodyear incorporates by reference, as if fully restated herein, the allegations set forth in the previous paragraphs of its Complaint.

59. In performing services for Goodyear, Premier owed Goodyear a duty of care.

60. Premier breached that duty of care by performing its services in a negligent and/or unworkmanlike manner.

61. Premier breached its duty of care to Goodyear by dropping the new Mixer Body No. 7, damaging it and other property owned by Goodyear.

62. As a direct and proximate result of Premier's negligence, Goodyear has suffered property damage in an exact amount to be proven at trial but believed to be in excess of $1,285,694.78, plus interest at the statutory rate.

63. As a direct and proximate result of Premier's negligence, Goodyear has also suffered procurement losses, losses to production and profits, and other consequential damages suffered during the period of time mixer no. 7 and other property was inoperable, or resulting therefrom, in an amount to be determined at trial but not less than $75,000.00.

WHEREFORE, Plaintiff The Goodyear Tire & Rubber Company respectfully prays for an entry of judgment against Premier Industrial Services, LLC as follows:

[1541603]

A. On all its Claims for Relief, compensatory damages for the damage to Goodyear's property in an amount to be determined at trial but not less than $1,285,694.78;

B. On all its Claims for Relief, compensatory damages for the procurement losses, losses to production and profits, and other consequential damages suffered during the period of time mixer no. 7 and other property was inoperable, or resulting therefrom, in an amount to be determined at trial but not less than $75,000.00;

C. On its First Claim for Relief, an award of Goodyear's expenses and costs, including attorneys' fees, expert fees and other legal expenses, associated with the litigation of this matter and Goodyear's attempts to enforce the Purchase Order;

D. An award of costs and pre- and post-judgment interest at the maximum statutory or other rate; and

E. Such other and further relief as this Court deems proper and just.

## Jury Demand

Plaintiff The Goodyear Tire & Rubber Company hereby demands a trial by a jury constituted of the maximum number of jurors permissible by law on all issues so triable.

Respectfully submitted,

/s/ Amanda M. Leffler
Amanda M. Leffler (0075467)
P. Wesley Lambert (0076961)
Michael J. Class (0100010)
**BROUSE MCDOWELL, L.P.A.**
388 South Main Street, Suite 500
Akron, Ohio 44311-4407
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
E-mail: aleffler@brouse.com
   wlambert@brouse.com
   mclass@brouse.com

[1541603]

                                                Joseph K. Cole (0086429)
                                                **BROUSE MCDOWELL, L.P.A.**
                                                300 Madison Avenue, Suite 1000
                                                Toledo, OH 43604
                                                Telephone: (419) 931-6910
                                                Facsimile: (419) 931-6911
                                                E-mail: jcole@brouse.com

                                                *Attorneys for Plaintiff*

[1541603]